# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                                 Criminal No. 07-423 (JMR  / SRN)

                        Plaintiff,
                                                          **REPORT AND RECOMMENDATION**

         v.

Robert James Deans, and
Jason Robert Zeimes

                        Defendants.

---

Leshia Lee-Dixon, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for U.S.A.

George E. Rapaich, Rapaich Law Office, 325 Cedar Street, Suite 300, St. Paul, MN 55101, for Defendant Robert James Deans.

John C. Brink, Brink & Gerdts, 331 Second Ave. South, Suite 110, Minneapolis, MN 55401, for Defendant Jason Robert Zeimes.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter comes before the undersigned United States Magistrate Judge on Defendants' dispositive motions:  Motions To Suppress Statements, Admissions and Answers (Doc. Nos. 16 & 38), Motions to Suppress Evidence Obtained as Result of Search and Seizure (Doc. Nos. 20 & 37), and Motions to Dismiss Indictment for Insufficiency (Doc. Nos. 39 & 43).  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a).  As explained in detail below, this Court recommends that Deans' Motion to Suppress Statements, Admissions and Answers (Doc. No. 16) be granted, that Zeimes' Motion to Suppress Evidence Obtained as Result of Search and Seizure (Doc. No. 37) be granted in part and denied in part, and that the remaining motions be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Law enforcement officials were investigating Defendant Jason Robert Zeimes and through use of an undercover officer set up a controlled buy from Zeimes to occur on November 1, 2007, following at least two previous controlled buys from Zeimes.  Officers arrested Zeimes following that transaction and then searched him–recovering an electronic pass key to a parking garage–and also searched his vehicle–recovering cellphones and keys to what appeared to be a mailbox and an apartment.  After using the key card to investigate the apartment building in which they suspected he resided, officers then used the other keys to determine in which apartment Zeimes likely resided.  Based on the information they thus obtained, they sought and obtained a warrant to search his apartment for documents and the controlled-buy funds.  The officers executing that search seized numerous items, including several digital scales.

Based at least in part on information obtained from the searches of Zeimes and his vehicle, the Minnesota BCA was also investigating Defendant Robert James Deans.  On November 15, 2007, they located him in North Dakota.  Officers arrested him that day pursuant to a warrant where he was residing–with his uncle in the uncle's trailer.  After obtaining consent from Deans' uncle, officers conducted a warrantless search of the premises and seized an address book and a telephone from that residence.  They then interviewed Deans following provision of Miranda warnings.

Defendants have been indicted for distribution of cocaine and for conspiracy to distribute cocaine.  (Doc. No. 1.)  They now present numerous dispositive as well as non-dispositive pretrial motions.[1]

_____

[1] At the hearing on this matter, the Government stated that it would not introduce at trial any statements of Zeimes obtained during and after his arrest.  Accordingly, his Motion to Suppress Statements, Admissions and Answers (Doc. No. 38) is moot.  The Court will separately

At the initial hearing on this matter on January 4, 2008, Minnesota BCA Agent Benjamin C. Rittmiller testified on behalf of the Government. The Court ordered additional briefing and scheduled a second motions hearing on the issue of the search of Deans' residence. Both Defendants filed waivers of their rights under the Speedy Trial Act. (Doc. Nos. 53 & 54.) At the second hearing on January 23, 2008, Deputy Sheriff Robert Fontenot testified on behalf of the Government and Mr. Deans testified on his own behalf.

## II.   DISCUSSION

Each Defendant has filed suppression motions contending that various warrantless searches and seizures were unconstitutional. In addition, Zeimes argues that the warrant to search his apartment was invalid and that the executing officers seized items beyond those authorized in the warrant. Deans asserts that his statement during his interrogation by officers was obtained in violation of his <u>Miranda</u> rights. Finally, each Defendant moves to dismiss the indictment. In light of the potential for the resolution of a particular motion to impact on the outcome of another, the Court will analyze the issues in chronological order.

### A.   Suppression Motions

With respect to warrantless searches, the Supreme Court has reiterated "'the basic rule of Fourth Amendment jurisprudence'":

> "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions."

<u>Horton v. California</u>, 496 U.S. 128, 133 n.4 (1990) (quoting <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978)).

---

issue an Order addressing Defendants' non-dispositive motions.

### 1.    Search Of Zeimes' Vehicle And Contents Thereof

In New York v. Belton, the U.S. Supreme Court held that "when a policeman has made a

lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident

of that arrest, search the passenger compartment of that automobile." 453 U.S. 454, 460 (1981).

In Thornton v. United States, the Supreme Court ruled that the rule of Belton is not limited to

situations where the officer makes contact with the occupant while the occupant is inside the

vehicle–"Belton governs even when an officer does not make contact until the person arrested

has left the vehicle." 541 U.S. 615, 617 (2004). "Once an officer determines that there is

probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to

preserve evidence by searching the entire passenger compartment." Id. at 623.

In Belton, the Court had elaborated that "[i]t follows from this conclusion that the police

may also examine the contents of any containers found within the passenger compartment, for if

the passenger compartment is within reach of the arrestee, so also will containers in it be within

his reach." 453 U.S. at 460. The Court clarified that the term "container" includes "closed or

open glove compartments." Id. at 460 n.4.

### (a)    Search of Zeimes' Vehicle

Here, Zeimes drove his vehicle to the location where the controlled buy of November 1

was to take place, parked his vehicle near that of the undercover officer and then got in the

officer's vehicle. Following the transaction, officers arrested Zeimes, apparently while he was

still in the undercover officer's vehicle. (Jan. 4th Tr. at 30-31, 43.) Officers then searched

Zeimes' person and seized from his wallet an electronic key card. They then also searched his

vehicle and seized a key ring containing two keys and several cellphones.

Zeimes first raises the question of whether the warrantless search of his vehicle was

proper under the Fourth Amendment.  (Jan. 4th Tr. at 18.)[2]  Zeimes notes that the officers arrested

him outside of his vehicle, handcuffed him, "and placed him in the back of a squad car some

twenty feet distant from the red Honda in which [he] had arrived."  (Mem. at 2.)[3]  Moreover,

Zeimes argues that the search warrant for his apartment was based exclusively on evidence that

"was obtained by a preliminary search that violated the Fourth Amendment," that is, the keys to

the garage door of Zeimes' apartment building and to his mailbox and his apartment.  (Id. at 7.)

The broad holdings of Belton and Thornton would appear to encompass the facts of this

case.  Thornton, 541 U.S. at 618 (upholding search of vehicle pursuant to lawful arrest of

defendant where defendant "drove into a parking lot, parked, and got out of the vehicle" before

officer had opportunity to pull defendant over and question him about suspicious behavior and

invalid license tags); Belton, 453 U.S. at 460 (upholding search of defendant's vehicle where

officer validly pulled defendant over, ordered occupants out of vehicle and then, after arresting

them, searched them and their vehicle).  As the Court noted in Thornton, "the arrest of a suspect

who is next to a vehicle presents identical concerns regarding officer safety and the destruction

of evidence as the arrest of one who is inside the vehicle."  541 U.S. at 621.

Granted, Zeimes had left his vehicle and voluntarily entered the undercover officer's

vehicle, where he was arrested, thereby seemingly negating any issue of the officers' need to

protect themselves from weapons or preserve evidence located in the vehicle.  In fact, Agent

Rittmiller agreed that "there was no possibility that [Zeimes] could get to [his vehicle] and

---

[2]  The Government claims the search was valid incident to Zeimes' arrest and expressly disclaimed reliance on an inventory search.  (Jan. 4th Tr. at 45.)

[3]  Agent Rittmiller testified that Zeimes "parked in the stall just to the front of [the undercover officer's] vehicle," and that at the time of the arrest Zeimes was "no more than 12 feet" from the front of his vehicle.  (Jan. 4th Tr. at 44.)

destroy any evidence or . . . get hold of any weapons." (Jan. 4th Tr. at 45.) The original justification for permitting a search of the passenger compartment of a vehicle in which an occupant was validly arrested was an application of the "immediate control" test of Chimel v. California that governs warrantless searches of premises incident to arrest. But the Court in Thornton–noting that Belton adopted a "clear rule" for vehicle searches that defined the area of "immediate control" as the entire passenger compartment–rejected any argument that the actual inability of the arrestee to access weapons or evidence precludes a warrantless search of the vehicle. 541 U.S. at 620-21.[4]

Accordingly, some have argued that the scope of the Supreme Court's rulings regarding the search of vehicles incident to arrest exceeds the underlying rational justification of Chimel, which permits a warrantless search incident to arrest only of the area in which a defendant would have to be able to retrieve a weapon or destroy evidence. For example, in Thornton Justice Scalia (who concurred in the judgment), declined to join the majority's opinion because "[t]he Court's effort to apply our current doctrine to this search stretches it beyond its breaking point." 541 U.S. at 625 (noting that search of vehicle occurred when defendant "was neither in, nor anywhere near, the passenger compartment" but rather "was handcuffed and secured in the back of the officer's squad car"). See generally 3 Wayne R. LaFave, Search and Seizure § 7.1(c), at

---

[4] Insofar as Zeimes argues that the search of his vehicle was unconstitutional simply because he could not have been able after his arrest to return to his vehicle either to access a weapon or to destroy evidence, the Supreme Court has ruled that "differing estimates of what items were or were not within reach of an arrestee at any particular moment" are not the proper inquiry–at least where the defendant is a "recent occupant." Thornton, 541 U.S. at 623. Here, Zeimes appears to have been such a "recent occupant" within the Court's contemplation. Id. at 623-24 ("So long as an arrestee is the sort of 'recent occupant' of a vehicle such as [defendant] was here, officers may search that vehicle incident to the arrest."). The Court expressly declined, however, to reach the issue of whether the scope of Belton should be limited to only those "recent" occupants of the vehicle "who are within 'reaching distance' of the car." 541 U.S. at 622 n.2.

531 (4th ed. 2004) (characterizing Scalia's dissent as having "rendered a devastating blow to the theoretical underpinnings of *Belton*").

More specifically, Belton and Thornton fail to impose any clear spatial or temporal boundaries in terms of a "recent occupant's" proximity to the vehicle.  In Thornton, the Court noted that "an arrestee's status as a 'recent occupant' may turn on this temporal or spatial relationship to the car at the time of the arrest and search."  541 U.S. at 622.  But as many have noted, the Court offered no clear parameters for defining a "recent occupant" or what temporal or spatial limits might apply.  See generally 3 LaFave, supra, § 7.1(c).

But where, as here, law enforcement officials are engaging in an investigation culminating in a controlled buy from a suspected drug dealer who drives his vehicle to the predetermined site of the transaction, it seems reasonable to conclude that the suspect might have further quantities of drugs left in the vehicle even though he exited that vehicle to conduct the transaction elsewhere.  On these particular facts, the Court finds the warrantless search of the vehicle incident to a valid arrest to fall within the scope of Belton and Thornton.  See Thornton, 541 U.S. at 632 (Scalia, concurring in the judgment) (proposing limitation on "Belton searches to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," such as drug offenses).

The Court notes that the majority decisions in Belton and Thornton did not expressly turn on the particular crime at issue and whether it was one that might involve additional contraband in the vehicle.  But because those broad holdings nevertheless seem to permit the search at issue here, any readjustment of the proper boundaries of those rulings is an issue for higher courts. See United States v. Grooms, 506 F.3d 1088, 1091 (8th Cir. 2007) (declining to address argument that Supreme Court's approval for broad search of vehicle "has strayed from its early rationale in

*Chimel*" because "only the Supreme Court can overrule Supreme Court precedent").

### (b)    Search of the Cellular Telephones

After officers arrested Zeimes, they also seized two cellphones from his vehicle.  They then searched the contents of those cellphones–that is, the electronic memory, which allegedly disclosed information linking the two Defendants.  Zeimes thus also argues that even if the officers could search his vehicle incident to his arrest under these circumstances, they nevertheless could not "search portable storage devices found in the car, such as cellular telephones . . . simply because the police come lawfully into *possession* of them."  (Mem. at 5 (emphasis in original).)

Zeimes contends that his expectation of privacy in "the memory of [his] cellular telephone" is analogous to the expectation of privacy in the content of electronic storage on computer disks that the Eighth Circuit addressed in United States v. James, 353 F.3d 606 (8th Cir. 2003).  But even assuming Zeimes would have a protectible privacy interest in the data stored in his cellphone, the question becomes whether the authority to conduct a warrantless search of an arrestee's vehicle under Belton extends to the electronic contents of a cellphone found in the vehicle.  In Belton, the Supreme Court ruled that the scope of the search of a vehicle conducted incident to the owner's lawful arrest extends to any "containers"–"whether it is open or closed"–within the passenger compartment.  453 U.S. at 460-61.  The Court further ruled that a "container"

> denotes any object capable of holding another object.  It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing and the like.

Id. at 460 n.4.  But Belton, decided in 1981 prior to the widespread use of cellphones, did not expressly address the authority to search such a device's electronic memory.

The Eighth Circuit does not appear to have directly ruled on this issue.  Several other circuits, however, have upheld warrantless searches of the memory of cellphones and similar devices incident to the arrest of the owner.  The Fifth Circuit has held that the arresting officers may search the arrestee's "cell phone pursuant to his arrest."  United States v. Finley, 477 F.3d 250, 260 (5th Cir. 2007).  The Fifth Circuit relied in part on the Seventh Circuit's holding in United States v. Ortiz that "the search of the vehicle was conducted pursuant to the automobile exception to the warrant requirement, and the information from the pager was properly seized incident to a valid arrest."  84 F.3d 977, 983 (7th Cir. 1996).  This Court agrees that if a cellphone is lawfully seized, officers may also search any data electronically stored in the device.

### 2.      Investigation of Zeimes' Residential Building

Using the keys obtained in the search of Zeimes and his vehicle following his arrest, Agent Rittmiller first used the electronic key card to gain access to the otherwise locked parking garage.  (Jan. 4th Tr. at 50.)  Officers realized that the garage served two separate but adjacent apartment buildings, not only the Dakota apartment building but also the Sibley Court apartments located at 484 Temperance Street.  The key card did not work to gain access to the Dakota building itself, but did work at the Sibley Court apartments.

### (a)      Entry Into Garage and Apartment Building

The first issue is whether officers could use the electronic key card to gain access to the parking garage and then the particular apartment building to which it also permitted entry.[5]  Agent Rittmiller conceded that both the garage and the building itself were locked, such that without the key card officers obtained by searching Zeimes following his arrest, they would not

---

[5]  As discussed above, it appears that the arresting officers obtained all of the keys without violating the Constitution.  See supra Section II.A.1.  But whether they lawfully seized the keys is not the same issue as what, if anything, they may then do with those keys.

have been able to enter the garage or apartment building.  (Jan. 4th Tr. at 49-50.)

Although both the garage and apartment building lobby and hallways were common areas accessible by all building tenants, they were locked and thus not accessible by the general public.  The question thus becomes whether officers may then lawfully use the keys they seized to gain access to an otherwise locked parking garage and apartment building.  The Eighth Circuit has ruled that tenants of an apartment building do not have a reasonable expectation of privacy in the hallway of that building even though the building was protected by a security system.  United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) ("The locks on the doors to the entrances of the apartment complex were to provide security to the occupants, not privacy in common hallways.") (expressly rejecting contrary conclusion of United States v. Carrigan, 541 F.2d 545 (6th Cir. 1976)).  Accordingly, the use of the keys to enter the garage and apartment building was not unconstitutional.

### (b)        Testing of Mailbox and Apartment Door Locks

Once inside that building, Agent Rittmiller then determined which apartment Zeimes resided in by first testing the mailbox key in various mailbox locks until he found that it would open mailbox number 517.  He did not, however, open the door of the mailbox so as to search its contents.  Armed with that information, Agent Rittmiller then proceeded to apartment number 517, where he tested the door key and confirmed that the key would open the door to that apartment.  He did not actually open the door, however, or attempt entry to the premises.  With this information, Agent Rittmiller applied for a search warrant for Zeimes' apartment.

The question is thus whether the mere testing of the mailbox and apartment door locks with the keys Agent Rittmiller had obtained constituted a search requiring probable cause.  The Eighth Circuit appears not to have squarely decided the issue yet.  United States v. Taylor, 119

F.3d 625, 629 (8th Cir. 1997) (stating that "[t]he Eighth Circuit has not decided whether trying a key in a lock constitutes a search for purpose of the Fourth Amendment" and deferring on issue).[6]

Although the other circuits are arguably split on the question, Taylor, 119 F.3d at 630, it appears that the majority hold that the use of keys solely to test locks does not violate the Fourth Amendment.  United States v. Salgado, 250 F.3d 438, 455-57 (6th Cir. 2001); United States v. Concepcion, 942 F.2d 1170, 1173 (7th Cir. 1991) ("Although the owner of a lock has a privacy interest in a keyhole–enough to make the inspection of that lock a 'search'-the privacy interest is so small that the officers do no need probable cause to inspect it.  Because agents are entitled to learn a suspects's address without probable cause, the use of the key to accomplish that objective did not violate the fourth amendment."); United States v. Lyons, 898 F.2d 210, 213 (1st Cir. 1990) (holding that mere insertion of key was not a search "or at least not an unreasonable search protected by the Fourth Amendment").  Absent any controlling authority to the contrary, this Court agrees that under these particular circumstances the investigation of the locks did not violate the Fourth Amendment.

### 3.      Lack Of Probable Cause For Search Warrant

With respect to the search warrant for Zeimes' residence, Defendant first argues that "[n]o reasons are advanced [in the warrant application] as to why Agent Rit[t]miller concluded that this apartment was Defendant's residence or that he even visited it, nor as to why any of the sought items could be expected to be located there."  (Mem. at 4.)

---

[6]  Cf. United States v. Dickson, 58 F.3d 1258, 1264 (8th Cir. 1995) ("We need not delve, fortunately, into the intricacies of whether trying a key in a lock is a search, or of whether, even if such an act is a search, the minimal intrusion is justifiable even without probable cause" because defendant "failed to prove that he had any legitimate expectation of privacy in the particular area searched.").

But following one of the earlier controlled buys, officers followed Zeimes to a parking ramp that they then believed was solely for the Dakota apartment building located at 209 East 8th Street. (Jan. 4th T. at 48-49.)   Moreover, after officers arrested Zeimes following the controlled buy on November 1 and seized various keys pursuant to searches incident to that arrest, they determined that the keys permitted access to the premises for which they then sought the search warrant. While it might be possible that Zeimes was simply house-sitting for another, the fact that he had keys to a particular residence and that officers observed him enter the garage for that building suggests the likelihood that it was Zeimes' own residence. A search warrant requires probable cause, not proof beyond a reasonable doubt much less absolute certainty. Illinois v. Rodriguez, 497 U.S. 177, 184 (1990) ("Warrants need only be support by 'probable cause,' which demands no more than a proper 'assessment of probabilities in particular factual contexts . . .'"). Moreover, it is reasonable to conclude that a drug trafficker might have contraband or evidence of criminal activity in his residence. Accordingly, the resulting warrant was adequately supported by probable cause.

### 4.      Particularity Of Search Warrant's Description Of Apartment

Using the information thus obtained, Agent Rittmiller sought a search warrant of Zeimes' apartment. Although Zeimes resided in apartment number 517, Agent Rittmiller's application mistakenly identified the particular apartment as

> 484 Temperence St. apartment # 484, St. Paul, MN.  55101.  Further described as a single family residential unit located within a multi-unit complex.  The number "517" appears on the lighting fixture outside the apartment door.

(Gov't Ex. 2, at 1-1 (emphasis added).)  The resulting warrant that issued on that application repeated that error.

At the hearing on this matter, Agent Rittmiller testified that his reference to the apartment

number on the first page of the application was simply a clerical error, an inadvertent repetition

of the street address of the building.  Agent Rittmiller was also the officer who executed the

warrant, however, and he searched apartment 517, Defendant's correct address, not the

mistakenly identified apartment 484.

This Court agrees that under these particular circumstances the error does not invalidate

the warrant for lack of particularity.

> To satisfy the particularity requirement, the place to be searched must be
> "described with sufficient particularity as to enable the executing officer to locate
> and identify the premises with reasonable effort" and to avoid mistakenly
> searching the wrong premises.

United States v. Thomas, 263 F.3d 805, 807 (8th Cir. 2001) (quoting United States v. Gitcho, 601

F.2d 369, 371 (8th Cir. 1979)).  "Typically, a warrant that is not particular enough cannot be

cured by the specificity of the affidavit supporting it."  Id. at 808.  "However, if the affidavit is

incorporated into the warrant, it may cure the particularity defect of the warrant if the affidavit

accompanies the warrant and the warrant uses suitable words of reference to incorporate the

affidavit."  Id.[7]

---

[7] It is not entirely clear whether the application was attached to the search warrant.  An error in the warrant's description of the premises to be searched may sometimes be cured by the application's description of the premises.  Thomas, 263 F.3d at 808.  Here, the application, while serving as the original source of the error, also stated:

> Your Affiant utilized the identified mail key and found that it operated the lock
> for mailbox number 517.  Your Affiant and SSA Nance went to apartment
> number 517 and utilized the identified apartment key to operate the one and only
> lock for apartment 517.  It should be noted that your Affiant did not remove any
> mail from the identified mailbox and did not open the door or make entry into
> apartment 517.

(Gov't Ex. 2, at 1-5.)  The application thus reinforces the conclusion that the warrant inadvertently repeated the building's street number as the apartment number.  But in light of the Court's ruling based on the information in the warrant itself and the fact that the applicant also executed the search, the Court need not decide this question.

Although "an obviously incorrect address standing alone" cannot satisfy the particularity requirement, id., not all inaccuracies will invalidate a warrant, id. at 807. But here, unlike situations where the "erroneous address was the only information in the warrant identifying the location to be searched," id., the erroneous repetition of the building address as the apartment number does not stand alone. Immediately following that error, the warrant itself correctly notes that the premises to be searched are "[f]urther described as a single family residential unit located within a multi-unit complex. The number "517" appears on the lighting fixture outside the apartment door." (Gov't Ex. 2, at 1-1.) The inclusion of the correct apartment number thus creates at most an inconsistency, a possibility that the correct apartment is either number 484 or number 517.

Here, the officers executing the warrant correctly identified the premises to be searched as apartment number 517 (quite possibly recognizing that the incorrect identification of the apartment number as "484" was simply an inadvertent repetition of the building address number). But the Court need not speculate as to how the executing officers correctly chose number 517 over number 484 because the executing officers included the Affiant who submitted the warrant application, which contained the same error as the warrant itself. See United States v. Clement, 747 F.2d 460, 461 (8th Cir. 1984) (upholding validity of search pursuant to warrant that specified wrong apartment number where the executing officer "immediately went to correct apartment" based on his personal knowledge). Cf. United States v. Gamboa, 439 F.3d 796, 806 (8th Cir. 2006) (upholding validity of search pursuant to warrant that specified wrong apartment number where the executing officers "had conducted extensive surveillance of the premises before the warrant was executed, . . . had personal knowledge of the premises that they intended to search, and the premises that they intended to search were, in fact searched"). In short,

"where the same officer both applied for and executed the warrant, a mistaken search is unlikely." Lyons v. Robinson, 783 F.2d 737, 738 (8th Cir. 1985).

**5.      Scope of Search Warrant And Items To Be Seized**

Zeimes also contends that the officers executing the warrant to search his residence did not have the authority to seize particular items.  The warrant authorized the seizure of only the "following described property and things:"

> Documents to include but not limited to; establish travel to New York, residency and names and contact information for customers and other[s] identified in this investigation.

> Minnesota Bureau of Criminal Apprehension confidential buy fund currency utilized in the controlled purchases from ZEIMES that occurred on October 4, 2007 and October 12, 2007.

(Gov't Ex. 2, at 2-1.)  Officers seized numerous items, including note pads, a day planner and address and telephone number books, as well as several digital scales.  (Def's Ex. 1.)

Zeimes concedes that officers executing a search warrant may seize items not listed in the warrant if those items are in plain view, but only as long as "the 'incriminating nature of the evidence [is] immediately apparent.'"  (Supp. Mem. at 10 (quoting United States v. Newton, 788 F.2d 1392, 1394 (8th Cir. 1986)).)  Zeimes contends that because the Government has not satisfied its burden of establishing that the incriminating nature of the unlisted evidence was immediately apparent, the plain view doctrine cannot apply here.  (Id. at 10-11.)

The Supreme Court has ruled that "even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition." Horton v. California, 496 U.S. 128, 130 (1990).[8]  Rather, the essential predicates of a valid warrantless seizure of evidence are

---

[8]  Accordingly, Zeimes' reliance on the test stated in Newton, which includes the inadvertence requirement, is misplaced.

(1) "that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) that "not only must the item be in plain view; its incriminating character must also be 'immediately apparent,'" and (3) "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." Id. at 136-37.  As the Eighth Circuit has summarized the requirements, "'an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, the officer has a lawful right to access the object.'" United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005) (internal citation omitted).

Here, the Government has provided no factual basis on which to evaluate these requirements. Cf. Khabeer, 410 F.3d at 482 (noting that items not listed in warrant could be seized where record supported that items were in plain view of officers who were lawfully present and who did not search beyond what warrant authorized).  But with the exception of the digital scales, the Court finds that it need not address the issue of whether any of the seized items fall within the "plain view" doctrine because Defendant has not shown that any of the seized items clearly fall outside of the categories specifically enumerated in the warrant.  The warrant authorized the seizure of "[d]ocuments to include but not limited to" certain particular items. Apart from the digital scales, items such as "gang writings," "misc. paperwork" and a social security card plausibly fall within the general category of "documents."  With respect to the scales, however, while their "incriminating character" is perhaps "immediately apparent" in a drug trafficking investigation, the Government has made no attempt to establish that the scales were found while the officers were properly searching for either documents or the controlled-buy

funds.  See Horton, 496 U.S. at 141 (noting that search pursuant to warrant must be confined to "places where [specified items] might be and must terminate . . . once [those items are] found").

### 6.    Search Of Deans' Residence

The next suppression issue concerns the warrantless search of Deans' residence. Following Deans' arrest, which was pursuant to a warrant, officers searched the room where Deans resided.  (Jan 4th Tr. at 39.)  Deans was arrested in a trailer where he resided but which was owned by his uncle, who also purported to consent to the arresting officer's request to search the trailer.  Such consent is, of course, a valid exception to the warrant requirement–assuming that the person providing consent has to the authority to do so with respect to the particular premises at issue.[9]  There are two separate issues here:  (1) whether Deans' uncle had the authority to consent to a search of Deans' room; and, if not, (2) whether the officers nevertheless reasonably concluded that Deans' uncle had such authority.

### (a)    Deans' Uncle Lacked Authority To Consent To A Search Of Deans' Room

Deans contends that because he had his own room in that residence, only he could consent to a search, which he did not provide.[10]  Deans had been residing for several months with

_____

[9]  Deans suggests that the issue is controlled by the Supreme Court's decision in Georgia v. Randolph, 547 U.S. 103 (2006).  But Randolph concerns searches of property over which several individuals share authority over a common area (such as spouses who occupy a marital residence together) and whether the consent of only one such occupant may permit a search that produces evidence used against another who refused consent.  Id. at 106.  Here, Deans and his uncle were not co-occupants of the entire trailer.  Rather, the uncle owned the trailer and rented only a portion to Deans, who appears to have had exclusive possession of that portion.

[10]  Agent Rittmiller testified that the search was "[i]ncident to Mr. Deans' arrest."  (Jan. 4th Tr. at 39.)  But Agent Rittmiller was not present for the search, as he had "left to follow Mr. Deans as he was being transported."  (Id. at 37.)  And in any event, Mr. Deans was arrested in the central living area of the trailer and thus any search of the premises would be confined to the area within Deans' "immediate control," which would not provide any justification "for routinely searching any room other than that in which an arrest occurs–or, for that matter, for

his uncle, receiving room and board in exchange for the services Deans provided caring for his uncle, who suffered from a variety of medical problems.  Deans had his own bedroom and bathroom and access to and use of areas such as the kitchen and living area of the trailer.  The Court agrees that Deans had a protectible expectation of privacy in his room.[11]

Although his uncle–who owned the entire trailer home–orally consented to the search of those premises, Deans' uncle lacked the authority to consent to a search of that portion "leased" to Deans.  United States v. Williams, 523 F.2d 64, 66 (8ᵗʰ Cir. 1975) ("[A] landlord cannot give consent to a warrantless search of leased premises."); see Georgia v. Randolph, 547 U.S. 103, 110-11 (2006) (noting holding of Chapman that "landlord could not consent to search of tenant's home").

The fact that Deans did not directly pay his aunt or uncle cash for rent does not change this result.  People v. Escudero, 23 Cal. 3d 800, 153 Cal. Rptr. 825 (1979) (noting that landlord's lack of authority "does not turn on the character of the demised premises" and "the rule is unaffected by the nature of the consideration given for the right to occupy the premises: it applies whether the tenant pays in money, . . . or in services").  As the Supreme Court of New Jersey explained, "[a] landlord does not acquire the authority to consent merely because the

---

searching through all the desk drawers or other closed or concealed areas in that room itself." Chimel v. California, 395 U.S. 752, 762-63 (1969).  The items seized were located, however, in Mr. Deans' bedroom.

[11]  Although Deans did not pay rent on a cash basis, his uncle and aunt provided him room and board in exchange for the services he provided caring for his uncle over several months.  Moreover, Deans' testified that everyone understood that it was his room and respected his privacy.  The Government contends that his uncle could enter Deans' room.  (Mem. at 21.) But the fact that a landlord may enter for certain purposes does not undermine the tenant's sole authority to exclude law enforcement officers who lack a warrant.  4 Wayne R. LaFave, Search and Seizure, § 8.5(a), at 209-10 & nn.12 & 13 (4ᵗʰ ed. 2004) (citing Chapman v. United States, 365 U.S. 610 (1961), and Stoner v. State of California, 376 U.S. 483 (1964)).

18

rental agreement is not reduced to writing or because the rent is paid in kind rather than in currency." State of New Jersey v. Coyle, 574 A.2d 951, 962 (N.J. 1990). See generally 4 Wayne R. LaFave, Search and Seizure, § 8.5(a) (4th ed. 2004) (noting that general rule that landlord may not consent to search of tenant's premises extends to "a room in a rooming house" and is not "otherwise 'merely because the rental agreement is not reduced to writing or because the rent is paid in kind rather than in currency'"). Accordingly, consent by Deans' uncle offers no basis to support the warrantless search of Deans' room.

### (b)     Apparent Authority Of Deans' Uncle To Consent

The Government contends that the officers nonetheless were entitled to rely on the statement of Deans' uncle that he owned the trailer and that Deans did not pay rent. (Mem. at 21.) In Illinois v. Rodriguez, the Supreme Court held that a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not have such authority. 497 U.S. 177, 179 (1990). To satisfy the Fourth Amendment's reasonableness requirement, the officer "conducting a search or seizure under one of the exceptions to the warrant requirement" does not always have to be correct in making factual determinations, but rather must only make a reasonable determination. Id. at 185. As the Court explained:

> [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? . . . If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

Id. at 188-89 (internal citation omitted).

Here, the arresting officer had been informed that Deans was residing with a family member who owned a trailer.  (Jan. 23rd Tr. 9.)  The officers lured another individual out of the trailer and employed a ruse–asking that individual whether "a guy that lived there" that the officer stated he used to know "was still there"–to determine that Deans was in fact inside the home.  The other stated that Deans was "inside.  He's in his bedroom."  (Id. at 11.)  Thus the arresting officers knew that Deans resided there–particularly, in "his bedroom."  On these facts, the officers could not reasonably assume that he was not a tenant with respect to his own room.[12]

But once the officers entered the trailer, they asked Deans' uncle if Deans paid rent.  Deans' uncle stated that Deans did not pay any rent.  (Jan. 23rd Tr. at 16.)  He also indicated he had full access to the entire trailer.  (Id.)  But he also told the officers that "Mr. Deans was hired by the family to take care of" him.  (Id.)  Thus the officers knew that Deans lived there in his own bedroom and also worked on the premises.  Although the issue is arguably close, the Court concludes that the arresting officers reasonably concluded that Deans' uncle had the authority to grant his consent to a search of the entire trailer.[13]

---

[12]  Deans thus had at least the same rights as an overnight guest, who has an expectation of privacy in the premises he occupies.  Minnesota v. Olson, 495 U.S. 91, 96-97 (1990).  Moreover, a host does not necessarily always have the authority to consent to a search of the premises occupied by a guest.  4 Wayne R. LaFave, Search and Seizure § 8.5(d) (4th ed. 2004).

[13]  Deans also contends that even if the court upholds the warrantless search of his residence, the Government was required to obtain a warrant to search the contents of the cell phone and address books that it seized during that search.  (Doc. No. 63.)  The Court has already ruled that officers could search the memory of Mr. Zeimes' cellphone that it seized during a warrantless search of his vehicle pursuant to his arrest.  See supra Section II.A.1(b).  There would appear to be no distinction with respect to a cell phone seized pursuant to a valid warrantless search of Deans' residence.

### 7.   Custodial Interrogation of Deans

On November 15, 2007, Agent Rittmiller interviewed Deans at the U.S. Marshal's Service Office in Bismarck, North Dakota.  Because it is clear that Deans was in custody, the issue becomes whether Agent Rittmiller interrogated Deans in violation of his <u>Miranda</u> rights. Furthermore, because Agent Rittmiller read Deans those rights early in the interview, the question becomes whether and when Deans invoked his rights and, if so, whether any subsequent statements were the result of impermissible questioning of Deans as opposed to being voluntary statements.

Under <u>Miranda v. Arizona</u>, "[i]f the accused indicates that he wishes to remain silent, 'the interrogation must cease.'  If he requests counsel, 'the interrogation must cease until an attorney is present.'"  <u>Edwards v. Arizona</u>, 451 U.S. 477, 481 (1981).  Although an accused may then waive his rights, any waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege."  <u>Id.</u> at 482.  Moreover, once the accused asserts his <u>Miranda</u> rights, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  <u>Id.</u> at 484.

Thus, the first issue is whether Deans invoked any of his <u>Miranda</u> rights.  The Supreme Court has ruled that "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994) (clarifying that an "ambiguous or equivocal" reference to an attorney that reasonable officer would understand as "only that the suspect *might* be invoking the right to counsel" is not enough).

Here, at the beginning of the interrogation, Agent Rittmiller stated he was looking for

someone named Rob.  Deans denied knowing Rob and also denied involvement in any criminal

activity.  After Agent Rittmiller then read Deans his rights, Deans immediately asked what were

the charges.  (Tr. at 4:15.)[14]  Agent Rittmiller explained he would be charged with conspiracy to

distribute a controlled substance.  Deans reiterated his denial of any involvement in any criminal

activity.

Deans then stated:  "I am not even going to say anything, you know, that's it.  I'm not

gonna say nothing because . . . if I was to say anything, you know, it could be construed as

something other than what it is."  (Id. at 4:20-22.)  Deans thus clearly invoked his right to remain

silent.  "When a defendant invokes his right to remain silent, officers must scrupulously honor

that right."  United States v. Kelly, 329 F.3d 624, 629 (8th Cir. 2003) (citing Michigan v. Mosley,

423 U.S. 96, 102-04 (1975)).  Nevertheless, Agent Rittmiller immediately pursued Deans, asking

"So you don't know Jason?"  (Id. at 5:3-4.)  Deans' subsequent statements therefore cannot be

viewed as voluntary and must be suppressed.

The remaining portion of the interrogation simply evidences Agent Rittmiller

compounding his original error.  Deans then denied culpability again.  Agent Rittmiller then

stated:  "Okay.  With that understanding then, with that premise laid there . . . can we talk about

Jason and what you –."  (Tr. at 5:19-24.)  Deans cut him off, stating:  "How do you think I can

talk about anything without a lawyer because, see, you know, you have got me charged with

something –."  (Id. at 5:25–6:3.)  Agent Rittmiller interjected:  "Right."  (Id. at 6:4.)

This constitutes an assertion of Deans' right to counsel.  Davis, 512 U.S. at 459 (noting

that invocation of right to counsel "requires, at a minimum, some statement than can reasonably

---

[14]  The Government submitted a CD containing an audio recording of the interview.  To
facilitate review, this Court had a transcript prepared.

be construed to be an expression of a desire for the assistance of an attorney"). Although this is

"an objective inquiry," id., Agent Rittmiller clearly understood it as such. Deans then yet again

denied involvement and rejected Agent Rittmiller's assertion that he "understood":

> MR. DEANS: You sit here and say you understand, but you have got me
> in cuffs.

> AGENT: No, I understand what you're saying. Okay.

> MR. DEANS: You know, so what am I supposed to say? Anything that I
> would say, like you said, could be held against me.

> AGENT: Right.

> MR. DEANS: So why in the hell would I even want to say a God damn
> thing to you because there's nothing – I have done nothing wrong, you see.

(Id. at 6:22–7:8.)

> After Deans then questioned why he had been arrested, Agent Rittmiller explained:

> AGENT: Give me just two seconds here. I don't want to interrupt you
> and be rude, but I just want to clarify something. Okay? I would like to talk to
> you more about this and probably answer some questions that you have, but you
> made reference to not talking without having an attorney present.

> MR. DEANS: Exactly and you know what that means.

(Id. at 8:3-11.) Agent Rittmiller responded: "Absolutely. So at that point our conversation is

done." (Id. at 8:12-13.) But Agent Rittmiller did not terminate the interview. Granted, Deans

then reinitiated the conversation, although arguably only in response to Agent Rittmiller's

statement. The agent then explained that he wanted "an opportunity to talk to [Deans] about the

case here." (Id. at 8:21-23.) Deans agreed, stating: "Okay. What's the case, run it through me?"

(Id. at 8:24-25.) But instead of merely outlining the case, the agent initiated the following

exchange:

> AGENT: But –

MR. DEANS:  No, no, not the but.  Let's not get no buts in it.  Run the case to me.

AGENT:  You [threw] the but in there with wanting an attorney.

MR. DEANS:  Well, there's no question about that.  Christ, I have got to protect myself.  You know, I have to protect myself.  Christ, you have got me in God damn bracelets and I ain't done a God damn thing and then you want me to trust you?

(Id. at 9:1-11.)[15]  Again, instead of immediately terminating the interrogation, the agent

reinitiated the conversation, drawing Deans out into making further statements:  "I understand

what you're saying, Bob, I do.  Okay."  (Id. at 9:12-13.)  Then in response to Deans' request for

an explanation of why he had been arrested, the agent again initiated the following exchange,

apparently intended to encourage Deans to engage in further conversation despite his having

requested counsel:

AGENT:  How about this, okay, can we agree on this, that I will sort of outline a little bit of what we know and I am not – I don't want you to say anything.  I just want you to sit there and listen.  Okay?

MR. DEANS:  Let me hear it.

AGENT:  Because as you made it pointedly clear –

MR. DEANS:  Let me hear it.

AGENT:  – you want an attorney, but you want to listen to at least what we have.

(Id. at 9:17–10-2.)

After summarizing the case against Deans, the agent then again engaged in the same

manipulative tactics:

---

[15]  While an "officer's mere description of the evidence and of potential charges against a suspect" do not necessarily constitute interrogation, United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (internal quotations omitted), here Deans had already invoked his right to remain silent as well as his right to counsel, and Agent Rittmiller failed to terminate the "interview."

AGENT:  I don't want you to say anything.  I don't want you to say anything.  Okay.  That's the situation you're in right now.  Okay.  No bullshit.  I am not here to lie to you.  I got no horse in the race to do that.

MR. DEANS:  I understand.  I understand.

AGENT:  So, now, here's – again, I am not going to – listen closely, Bob.  I am not going to ask you any questions.  I am not going to ask you to tell me anything, okay, because you have asked for an attorney.
As far as the interview part of this conversation goes, that's done.  Okay.  I am not going to ask you anything anymore.
I thought it was fair to you to sort of outline what got you into this situation because it's the right thing to do because I would understand being in your situation you would wonder how you got wrapped up in this.  That's how it happened and I think it's fair that you know that.
Okay.  If you have any questions of me, you can ask me, but I am not going to ask you any questions.

(Id. at 11:4–12-3.)  The ploy worked, prompting Deans to continue talking and asking whether

the officers knew of the participation of a particular individual.  Then by stating that he did not

want to question Deans about the case, the agent provoked Deans into further conversation:

AGENT:  But do you understand what I just said?

MR. DEANS:  I understand exactly what you're saying.

AGENT:  No, I am not saying about even the case.  I'm saying you've asked for an attorney, Bob.  I am not going to –

MR. DEANS:  Hold on.  Hold on.  Hold on.  Hold on.  You know –

AGENT:  I only wanted to layout the information so you knew.

MR. DEANS:  Okay.

AGENT:  Okay.

MR. DEANS:  So I knew who was really involved and who really wasn't involved and who you are not going to get involved.

AGENT:  No.

MR. DEANS:  Because you don't have a real deal at all, see.  You know, you're just – you're picking pieces out of this puzzle.

> AGENT:  Bob, okay.  I don't want to talk to you anymore about the case other than outline it because you have asked for any attorney.  Okay?
>
> DEANS:  Okay.

(Id. at 13:17–14:16.)  Even then, the officer persists in drawing Deans out by telling him "I didn't mean to agitate you."  (Id. at 14:17.)

In sum, although Deans made statements after each of the assertions of his rights, the Court cannot construe his statements as knowing and voluntary waivers of his rights for several reasons.  First, Deans consistently denied both engaging in any wrongdoing and having any knowledge that he could provide the Agent.  Indeed, the interview ends with Deans questioning the Agent–who had offered his card and telephone number to Deans should he "change his mind"–why he would want to change his mind about having invoked his rights.  (Id. at 16:11-17; id. at 17:21–18:11.)  Had Deans intended to knowingly waive his rights, he would not continue to deny his involvement or having anything to talk to the agent about.

Second, Deans' statements after invoking his rights were not uttered in a vacuum.  Rather, Agent Rittmiller, instead of "scrupulously honoring" that request by terminating the interrogation, repeatedly persisted in continuing the interview.  Granted, his statements often were not direct questions.  "Interrogation" includes, however, not just "express questioning," but also "its functional equivalent."  United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291 (1980)).  Here, the Court concludes that the officer's statements were designed and intended to elicit further statements from Deans despite Deans' clear statement that he was not going to say anything further.  In fact, by repeatedly informing Deans that he could not continue the interview and that Deans should not say anything further because Deans had invoked his Miranda rights, Agent Rittmiller in effect goaded Deans into continued conversation.

While a suspect may waive his rights "after receiving the *Miranda* warnings, once the suspect invokes his rights "he is not subject to further questioning." <u>Davis</u>, 512 U.S. at 458. This prophylactic rule "is 'designed to prevent police from" doing exactly what happened here–an attempt at "'badgering a defendant into waiving his previously asserted *Miranda* rights.'" <u>Id.</u>  In short, once the accused asserts his <u>Miranda</u> rights, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981).  Accordingly, the entire interrogation after that first assertion of his right to remain silent was in violation of Deans' <u>Miranda</u> rights.

### B.      Sufficiency of the Indictment

Finally, each Defendant moves to dismiss the Indictment, arguing that Counts 2, 3, & 4 of the Indictment "improperly charge 18 U.S.C. § 841(b)(1)(B) as the statutory violation for the offense" even though that statute "proscribes statutory mandatory minimums for quantities that do not apply for any of those counts."  (Doc. Nos. 39 & 43.)[16]  Counts 2, 3 and 4 each allege the distribution of cocaine on three different dates and each Count alleges that such actions were in violation of Section 841(a)(1) as well as of Section 841(b)(1)(B).  (Doc. No. 1.)

Section 841(a) defines certain unlawful acts with respect to controlled substances and Section 841(b) provides penalties for those who violate subsection (a).  21 U.S.C. § 841.  Section 841(b)(1)(A) and Section 841(b)(1)(B) provide varying penalties for violations with respect to particular controlled substances, the difference being the amount of each controlled substance at

---

[16]  Defendants reference Section 841 of Title 18, but that section provides definitions for the rest of Chapter 40 of that title, which prohibits explosive materials.  The Court assumes that Defendants intended to refer to Section 841 of Title 21, which is what the Indictment in fact cites.

issue.  Id.  The statute measures amounts in terms of the metric system–grams and kilograms.  Id.

The three distribution counts of the Indictment alleged the distribution of approximately 2 ounces, 4 ounces and 3 ounces of a controlled substance respectively.  Because one ounce equals approximately 28 grams, each of the counts alleged distribution of no more than 112 grams.  Accordingly, neither Section 841(b)(1)(A) nor Section 841(b)(1)(B) would apply as they provide penalties for distribution of a mixture or substance containing cocaine for amounts of a minimum of 5 kilograms or 500 grams respectively.

The Government concedes the error, but argues that it is irrelevant because the Indictment need not specify the statutory penalty at all and the inclusion of an erroneous reference to a statutory penalty provision inflicts no prejudice.  (Doc. No. 46 at 3-4.)  The Court agrees that the inclusion of the statutory penalty was unnecessary and thus that any error with respect to that statute does not undermine the Indictment.  See United States v. McIntosh, 23 F.3d 1454, 1457 (8th Cir. 1994); United States v. Mastrandea, 942 F.2d 1291, 1293 (8th Cir. 1991).

In the alternative, Defendants seek disclosure of the grand jury transcripts in order to "verify that the grand jury was improperly instructed as to the law and facts in order to return an indictment improperly charging violations of 18 U.S.C. § 841(b)(1)(B)."  (Doc. Nos. 39 & 43.)  As this Court has ruled that the error is irrelevant, there is no need order any such disclosure.

## III.      RECOMMENDATIONS

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.      Deans' Motion To Suppress Statements, Admissions and Answers (Doc. No. 16) be GRANTED;

2.      Zeimes' Motion To Suppress Statements, Admissions and Answers (Doc. No. 38)

be DENIED AS MOOT;

3.      Deans' Motion to Suppress Evidence Obtained as Result of Search and Seizure

(Doc. No. 20) be DENIED;

4.      Zeimes' Motion to Suppress Evidence Obtained as Result of Search and Seizure

(Doc. No. 37) be GRANTED IN PART (insofar as it pertains to the digital scales seized from

Zeimes' apartment) and DENIED IN PART (insofar as it pertains to all other evidence);

5.      Deans' Motion to Dismiss Indictment for Insufficiency (Doc. No. 43) be

DENIED; and

6.      Zeimes' Motion to Dismiss Indictment for Insufficiency (Doc. No. 39) be

DENIED.

Dated:  February 13, 2008

           s/ Susan Richard Nelson   

          SUSAN RICHARD NELSON
          United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by February 28, 2008, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.